Cynthia A. MORSE and Allen E. Morse, Plaintiffs,

v.

**MUTUAL FEDERAL SAVINGS & LOAN ASSOCIATION OF WHITMAN, Defendant.**

**Civ. A. No. 79–1966–A.**

United States District Court, D. Massachusetts.

April 8, 1982.

Paul S. Samson, Riemer & Braunstein, Boston, Mass., for plaintiffs.

Terry O'Malley, Mark L. Sullivan, Spencer & Stone, Boston, Mass., for defendant.

## REVISED OPINION

BAILEY* ALDRICH, Senior Circuit Judge.

In 1978 plaintiffs Allen and Cynthia Morse owned a house in Halifax, Massachusetts. It was jointly mortgaged to defendant, Mutual Federal Savings and Loan Association of Whitman. Plaintiffs also had a joint Now checking account with defendant. In 1979 a friendly relationship between the parties developed into deep trouble because of carelessness, *in a degree not here deter-*

* Sitting by designation.

mined, on the part of Allen, in turn matched by over-reaction on the part of defendant. Suit was brought in this court by the Morses, alleging two federal claims, and a large number of dependent state claims. Although the basic federal claims were of no account, unfortunately a predecessor on this court denied defendant's motion for summary judgment and elected to retain pendent jurisdiction as to the balance although there were principally involved difficult questions of Massachusetts law which should better have been decided by the Massachusetts court. By the time the case was assigned to me for trial it seemed late to make the change, and I did not do so. To isolate these questions, with the parties' approval I put thirteen special questions to the jury on liability, and thereafter a number on damages. While the latter raise some problems, to the jury's credit its answers on liability were, in my opinion, both consistent and reasonable. Based on these answers, and the undisputed facts, I recite the following.

Allen, since 1973, had leased an Amoco filling station and garage from Buckley Heating Company, from whom he also bought his gasoline, oil and supplies. He ran it mostly single-handed, with help from Cynthia, but not as a joint enterprise. Although in one sense he was doing well, he increasingly had difficulties meeting his weekly, and later more frequent, payments due Buckley. Buckley insisted upon receiving cash, or a cashier's check, measured by the gallons sold as shown on the pumps' meters, current to the very day before. Allen had a checking account with the Rockland Trust Company, but it was more convenient to get his last-minute cashier's check from defendant. His practice was to give defendant a personal check on the Rockland bank, for which, quite apparently as a favor to a customer (whether there was a charge does not appear), defendant would give him a cashier's check, which he would give Buckley. The extent of this favor is quite apparent, because between February 1 and 4, 1979, defendant, at its branch of-

fice, so issued some $8,600 in cashier's checks, in effect unsecured loans totalling almost the size of the mortgage, and roughly four times the amount of the Now account. Earlier during January, Allen had been overdrawing his Rockland account. All four checks he gave defendant for the $8,600 were returned unpaid.

Allen responded to a telephone call and came to defendant's main office on February 12, where he had a conversation with a Mr. Leetch, vice president and treasurer. He told Leetch that he believed that Rockland had erred, and that he wanted to investigate. Leetch agreed. In response to a question of what was defendant's procedure in the case of bad checks, Leetch said that it took various forms, including the institution of criminal proceedings if there was believed to have been fraud. Leetch testified that, in fact, he believed there was no fraud here, but he did not tell this to Allen. The jury found that while Allen reasonably construed the conversation as a threat of possible criminal proceedings, Leetch's conduct was not knowingly or wilfully unfair. It further found that it caused neither plaintiff any damages.

Allen, before leaving, gave Leetch $1,950 in cash to reduce the bad check indebtedness. Leetch testified he told Allen he would add the rest ($6,650) to the mortgage. This was done, on the records, on February 13. While Leetch testified that Allen agreed to this, the jury found he did not. Nor was there evidence that Cynthia agreed. Accordingly, defendant had no conceivable right to attach the mortgage security to this debt, even with the somewhat limited, and secondary, effect that it maintains was its purpose.[1] This impropriety was not cured by defendant's persuading Allen to sign a note for $6,650 on February 23, payable March 15, to which, later, Cynthia added her signature. The given purpose was to relieve the immediacy of the bad check indebtedness; defendant concedes, as it must, that it did not establish an

1. The entries on plaintiffs' mortgage book show that defendant also proceeded to charge them interest at 9.5 per cent on the entire mortgage balance, including the back check indebtedness. Unpaid interest was added to the mortgage principal.

**1276**

enforceable lien on the Morses' home. Since the note was a substitute for a presently due debt of Allen only (the jury having found that Cynthia was not a joint venturer), Cynthia is to be regarded as a surety or guarantor. Consistent with its finding of no damages from the believed threat, the jury found that both Allen and Cynthia would have signed the note regardless of Leetch's remarks about criminal proceedings. The note, consequently, was valid as to both, Mass.G.L. c. 106 § 3–408; cf. *Mohan v. Woburn Nat'l Bank*, 1943, 313 Mass. 306, 47 N.E.2d 289, Cynthia's consideration being the perceived benefit to Allen of her signing.

■ In point of fact, the Rockland bank was not in error with respect to Allen's balance. He was in such financial difficulties that when the note fell due on March 15 plaintiffs were unable to or, at least, failed to, pay it off. Defendant thereupon "froze" or "attached" their joint Now account without notifying plaintiffs of its action. As a result, eight checks drawn on the account by Allen were dishonored. Defendant now seeks to justify the freezing, and the dishonor of the checks, as a "set off." It did not, however, actually set off the proceeds of the account, some $2,020, until June 5. It argues that this was a mere technicality, but this is not so. Until June defendant charged plaintiffs 9.5 per cent interest on the entire bad check indebtedness, including the amount that there should have been set off in March, while, at the same time, it deprived them of the use of their Now account.[2] The claimed set off was improper. Mass.G.L. c. 106 § 4–303; *Raymer v. Bay State Nat'l Bank*, —— Mass. ——, —— ——, 1981 Mass.Adv.Sh. 1870, 1875–76, 424 N.E.2d 515, and the checks were wrongfully dishonored. *Id.* Even had it been proper, it was inexcusable for defendant not to have advised plaintiffs immediately of its action.

Monthly payments of $200 were due on the mortgage, with an acceleration clause in the case of 60 days' default. The February

1, 1979 payment had not been made. On March 17 plaintiffs sent their 18-year old daughter to defendant's branch office with $200 in cash. Pursuant to some standing instructions, it was not accepted, and she was told to go to the main office. However, the branch office did not give her back the mortgage book. Plaintiffs did nothing further. After April 1, the February payment being, in defendant's view, 60 days overdue, defendant's committee voted to initiate foreclosure proceedings, and this was done. A foreclosure sale was then advertised in a local paper.

■ Plaintiffs received no notice that defendant did not consider their daughter's bringing the $200 to the branch office on March 17 a proper tender. As matter of law, defendant was wrong. Plaintiffs regularly dealt with the branch office, they did not have to make a second tender at the main office, or face what, in view of the refusal, they feared they might meet there. Accordingly, the mortgage was not 60 days in default, and defendant had no right to foreclose or to publish a notice of foreclosure. Moreover, the jury warrantably found that defendant acted in bad faith, in that it brought the foreclosure proceedings for the ulterior purpose of collecting the back check indebtedness. While plaintiffs' theory that this was an abuse of process must fail because foreclosure by statutory power of sale does not involve sufficient "legal process," *Jones v. Brockton Public Markets, Inc.*, 1975, 369 Mass. 387, 340 N.E.2d 484; see *Beaton v. Land Court*, 1975, 367 Mass. 385, 326 N.E.2d 302, *appeal dismissed*, 423 U.S. 806, 96 S.Ct. 16, 46 L.Ed.2d 27, they have made out an action in tort for wrongful foreclosure. *See, e.g., Sandler v. Green*, 1934, 287 Mass. 404, 407, 192 N.E. 39, *Siegel v. Knott*, 1944, 316 Mass. 526, 55 N.E.2d 889. However unhappy defendant may justifiably have felt about the general situation, this action for that purpose was inexcusable.

---

**2.** During this period defendant did credit plaintiffs with interest on the Now account, but at the lower rate of 5 per cent.

■ Defendant was charged by the jury with further improprieties. Faced with foreclosure, plaintiffs hired a lawyer and obtained a postponement of the sale, seeking to refinance the mortgage and obtain a larger one for the purpose of making repairs and improvements. The National Bank of Wareham expressed willingness to an agreed larger sum, which left the necessary excess after paying all believed debts to defendant. Defendant, however, refused a discharge except upon the payment of a greater amount, which included the 1972 note, attorneys' fees, an escrow debit, and the 1979 note, all, apparently, with 9.5 per cent compound interest, and another sum for which I cannot account. While there might be a dispute as to just how much larger, the amount demanded was substantially more than what was legally due. Because this was more than the Wareham bank had figured on, the new financing fell through. The jury warrantably found that defendant was wilfully or knowingly unfair in causing this to happen. Shortly thereafter, this suit was filed, and the foreclosure sale was put off pending its outcome.

One final matter. Plaintiffs sought an auto loan to finance a new car. The jury found that defendant furnished the lender with a credit report that was wilfully or knowingly unfair or deceptive. This resulted in several months' delay. However, the jury found no damages. I find nothing to criticize. When plaintiffs reapplied for the loan, they sought, and obtained, a much larger one, and bought a much better car. Evidently the jury found that that evened matters out. While plaintiffs claim that under Mass.G.L. c. 93A they should still receive attorney's fees, they face an insuperable obstacle. A condition precedent to recovery under section 9 of the statute is a demand. The present suit was already under way, but, at the least, the amended complaint introducing the auto loan rejection could have contained a substitute procedure. Instead, the amendment did not even mention the statute.[3]

Before considering these matters more fully, I note Allen's claim that he ultimately lost the filling station lease because of defendant's having frozen the Now account. It is true that the freezing caused checks to Buckley in the amount of $1,768 to be dishonored, but Allen immediately rectified the deficiency, and was able to explain that it was the bank's error. The claim that this led to Buckley's terminating five months later when large, unremedied arrearages developed, permitting Allen, incidentally, to introduce in colorful detail asserted enormous losses, was quite properly rejected by the jury.

### Cynthia

### *The Federal Claims*

Before dealing with the claims individually, it would be well to dispose of the federal ones. Only Cynthia has such. She asserts claims under the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601–1667e, and the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691–1691f, both in connection with the 1979 promissory note. Neither has merit.

■ The claim under TILA is that defendant should have made certain disclosures when the note was signed, and Cynthia should have been allowed to rescind. The entire transaction, however, is exempt because the "extension of credit" underlying the 1979 note was for "business or commercial purposes." 15 U.S.C. § 1603(1). The ultimate purpose of the "credit" was to pay for supplies, *see Poe v. First Nat'l Bank*, 1979, 5 Cir., 597 F.2d 895 (per curiam), and it is immaterial that Cynthia was

---

**3.** I cannot agree with plaintiffs that under F.R. Civ.P. 15(b) defendant has waived its objection to the lack of the required demand by impliedly consenting to the trial of this issue under Chapter 93A. This purported consent seemingly consists of not objecting to my submitting to the jury special questions relating to the car loan phrased in terms of the statute. Since the parties were told that I was reserving questions of law, defendant's lack of an objection should not constitute a waiver of a valid legal defense—the more so since plaintiffs' failure to plead the statute gave defendant no cause to consider its possible defenses. Where plaintiffs were fully aware that they had this claim and made a deliberate choice to proceed differently, they should be bound.

not involved in running the business. *Id. Lammerding v. Shawmut Community Bank*, 1980, 9 Mass.App. 545, 402 N.E.2d 1085 (applying same language in section 2(a) of Massachusetts Truth in Lending Act, Chapter 140C §§ 1–13).

■ Cynthia's ECOA claim relies upon section 202.7(d) of Regulation B, 12 C.F.R. § 202, promulgated by the Federal Reserve Board pursuant to 15 U.S.C. § 1691b. She argues that the bank discriminated against her on the basis of her marital status in requiring her to sign the 1979 note. This is a total misconception. Cynthia was not an "aggrieved applicant" for credit entitled to bring a private cause of action by 15 U.S.C. § 1691e(a). The debt was Allen's, and the note was an extension or renewal of credit to him. Cynthia signed only as a "guarantor, surety, endorser, or similar party." (Regulation B, § 202.2(e) ) She is implicitly excluded from the statutory definition of an applicant, 15 U.S.C. § 1691a(b), and explicitly excluded by Regulation B, § 202.2(e). If requiring Cynthia's signature was improper (which, in light of defendant's many arguments seems doubtful), the affront was not to her, but to Allen, who was unable to secure "credit" without the signature of his wife.

*Allen and Cynthia—The Common Law Claims*

In total, the jury found damages for four wrongful acts: 1) adding the bad check indebtedness to the mortgage; 2) freezing the Now account, and failing to give notice, causing the dishonor of eight checks; 3) instituting foreclosure proceedings; and 4) preventing the refinancing of a new mortgage. It found that each was wilfully or knowingly unfair, but that defendant did not, by "extreme and outrageous conduct intentionally cause severe emotional distress."

*1. The adding of the bad check obligation to the mortgage.*

■ The only direct injury suffered by plaintiffs from defendant's adding the bad check obligation to the mortgage, apart from hurt feelings, was defendant's commencing to charge interest at the mortgage rate of 9.5 per cent forthwith, instead of at the then statutory rate of 8 per cent. As soon as the note was executed plaintiffs agreed therein to the mortgage rate, a practical ratification of that past, brief and miniscule, discrepancy. Indirectly, there was the possibility that if plaintiffs defaulted for sixty days in their $200 monthly payments on the 1972 note, the defendant's security interest, in case of foreclosure, would include the 1979 indebtedness in addition to the initial obligation. Since, however, even without adding the indebtedness to the mortgage, defendant could collect it in the event of a foreclosure sale by attaching excess proceeds, it is difficult to see how plaintiffs were harmed thereby.[4] While, conceivably, some other creditor might get in ahead of defendant's attachment, the substitution of one creditor for another is not damaging to a debtor. *Raymer v. Bay State Nat'l Bank*, ante.

■ The only substantial possibilities of harm were that defendant might purport to foreclose on the mortgage for the nonpayment of the bad check obligation, or that plaintiffs would be in a poorer position to borrow money on the security of their house by reason of the claimed reduction of their equity. Since those were both separately considered by the jury, and damages awarded when the harms materialized, *see* post, a prospective award of damages for those harms would be duplicative. Hence, without objection, I put no separate question to the jury of actual damages here. The minor excess interest charges alluded to above not having been paid by plaintiffs, defendant's bookkeeping merely gives them an action in contract for nominal damages,

4. Plaintiffs point out that a mortgage foreclosure would be final, while, in case of an attachment, there would be a year's right of redemption. The difference is presently irrelevant because we are speaking of an attachment of the proceeds of an assumed independent mortgage foreclosure, not an attachment leading to a sheriff's sale.

e.g., *King Features Syndicate, Inc. v. Cape Cod Broadcasting Co.*, 1945, 317 Mass. 652, 655, 59 N.E.2d 481; it does not entitle them to damages for mental suffering. *Stratton v. Posse Normal School of Gymnastics*, 1928, 265 Mass. 223, 163 N.E. 905. If this ruling should be reversed, I will grant defendant a new trial as to the amounts, as I find the jury award grossly excessive.

2. *Freezing the Now account without notice.*

Except for allowing the ignorant drawing of checks which were dishonored, there were no actual damages, other than a minor adjustment of interest on the 1979 note, that resulted from defendant's having pursued the wrong means of stopping payment on the Now account. Since Cynthia drew no checks (and, indeed, Allen had promptly sought to draw out almost the entire account after the March 15 note was overdue, so that there was little for her to draw against), without objection I put no question to the jury as to her actual damages. I did put mental damages, but I now rule there was no basis for such, as any mental suffering on her part was essentially vicarious, and not legally cognizable. *Cf. White v. Spence*, 1977, 5 Mass.App. 679, 369 N.E.2d 731.

▆▆▆ Allen does have a claim under Mass. G.L. c. 106 § 4–402. The statute's limitation to "actual damages" in case of dishonor due simply to mistake, whatever, in this context may be meant by "actual damages,"[5] is inapplicable, because the dishonor was not a "mistake." *Raymer v. Bay State Nat'l Bank*, ante. Consequently, Allen may, under this statute, recover "damages proximately caused" by the wrongful dishonor, which include mental suffering and loss of reputation. The jury found actual damages of $2,020.73, the exact amount of the account. This seems not unreasonable, especially having in mind that $1,768 went to Buckley. The jury could well accept the testimony that Buckley's representative was angry. Even though he testified he got over it when Allen promptly remedied the deficiency and explained that it was defendant's fault, there was evidence permitting a finding that, as a result, Buckley restricted Allen's ability to accept credit card sales, causing a decline in business.[6] I have more difficulty with the mental suffering, as to which the jury found an additional $2,200. I accept it, as to Allen, although with reluctance, as compensating the false defamatory implications arising from the temporary financial embarrassment. I have especial reluctance because the larger implication, that Allen was in effect overdrawn at the bank, was quite correct.

3. *The attempted foreclosure.*

▆▆▆ Both plaintiffs have common law claims with respect to the attempted foreclosure. The jury found, as to each, $3,250 "mental damages," and "lawyer's fees" as "other damages." The lawyer's fees referred to would appear to be those paid by a Mr. Ryan to obtain a postponement of the foreclosure sale and to attempt refinancing. Recent cases suggest that these expenditures are not recoverable as damages. *See, e.g., Harrison v. Textron, Inc.*, 1975, 367 Mass. 540, 554, 328 N.E.2d 838; *Chartrand*

---

5. The term "actual damages" can, in the vernacular, present a can of worms. In *Wiley v. Bunker Hill Nat'l Bank*, 1903, 183 Mass. 495, 67 N.E. 655, the court held that, even for a non-malicious dishonor, a "trader" could recover for presumed loss of reputation, without actual proof. Both the Massachusetts Code comment and the Uniform Commercial Code Comment in section 4–402 state that the actual damage provision is to avoid that result. *But cf. Ellis v. Brockton Pub. Co.*, 1908, 198 Mass. 538, 543, 84 N.E. 1018.

6. In all fairness one might ask what would have happened to Allen's credit rating and his business had the original $8,600 in checks bounced on Buckley rather than on defendant. As matters work out, defendant receives no credit for providing plaintiffs with this windfall. I mention it, however, as plaintiffs argue that they lost a possibly larger overall recovery by reason of fragmenting their claim into separate episodes. I question this, but if it has merit, and one is to look at the case overall, the benefit Allen received by appeasing Buckley in February when he did not deserve to, more than offset any loss incurred by separating individual damages claims.

*v. Riley*, 1968, 354 Mass. 242, 237 N.E.2d 10 (overruling *Malloy v. Carroll*, 1934, 287 Mass. 376, 384–88, 191 N.E. 661). Any doubt on this issue I will resolve against plaintiffs, since the jury did not, and I believe could not, set a dollar amount on the fees as Ryan, although called as plaintiff's witness, furnished no basis for a finding on this subject.

 There can be no problem with the mental damages amounts. Where defendant's wrongful acts were a wilful misuse of its statutory power of sale, and could be expected to humiliate and distress plaintiffs, they may recover compensation for mental suffering. *Malone v. Belcher*, 1913, 216 Mass. 209, 212, 103 N.E. 637. Assuming that the jury understood "mental" damages to include defamation and loss of reputation (or else it cannot be found to have awarded any damages for such, in spite of plaintiffs' credible testimony) wrongly advertising a foreclosure can support an award of such damage. *See Goss v. Needham Cooperative Bank*, 1942, 312 Mass. 309, 44 N.E.2d 690.

### 4. *Preventing refinancing.*

 Wilfully or knowingly interfering with plaintiffs' arrangement to refinance through the National Bank of Wareham, by demanding sums knowingly improperly charged against them, qualifies as an actionable tort for wrongful interference with an advantageous contractual arrangement. *E.g., Owen v. Williams*, 1948, 322 Mass. 356, 77 N.E.2d 318; *Chemawa Country Golf, Inc. v. Wnuk*, 1980, 9 Mass.App. 506, 402 N.E.2d 1069. The jury awarded $1,100 mental damages to each plaintiff, which are allowable. *Gould v. Kramer*, 1925, 253 Mass. 433, 439–40, 149 N.E. 142.

### *Chapter 93A—Applicability to Defendant*

 Both plaintiffs seek double, or triple (which I find unwarranted) damages and attorney's fees under Mass.G.L. c. 93A, which proscribes unfair and deceptive trade practices. Defendant responds with the

broad assertion that it is not subject to the statute. That the legislature did not intend to include it is effectively answered by the recent case of *Raymer v. Bay State Nat'l Bank*, ante, which applied the act to a national bank. There is no reason for regarding federal savings and loan associations differently.

 Next, defendant contends that, as a matter of federal law, the statute is preempted by the Federal Home Owners' Loan Act, 12 U.S.C. § 1464(a), and various regulations promulgated by the Home Loan Bank Board thereunder. This is a more troublesome question. The Supremacy Clause dictates that when state and federal law conflict, state law must give way. The conflict need not be direct. A state law may be invalid because federal regulation of an area is so pervasive as to "occupy the field" and preempt state legislation by implication, *e.g., Parker v. Brown*, 1943, 317 U.S. 341, 350, 63 S.Ct. 307, 313, 87 L.Ed. 315, or because it imposes an "undue burden" upon the performance of a federal instrumentality's functions, *e.g., Anderson Nat'l Bank v. Luckett*, 1944, 321 U.S. 233, 248, 64 S.Ct. 599, 607, 88 L.Ed. 692. In the absence of any specific conflicting statute or regulation here, defendant argues implied preemption from Congress having generally occupied the field, a question as yet not determined in this circuit. *See First Federal Savings & Loan Ass'n v. Greenwald*, 1 Cir., 1979, 591 F.2d 417, 426 n.16. Although there is considerable dicta, defendant cites no case that goes that far.[7] The fact that federal statutes or regulations covering some aspects of a regulated area are, by necessity, complex and detailed, does not imply that Congress intended to occupy the entire field to the exclusion of state law. *De Canas v. Bica*, 1976, 424 U.S. 351, 359–60, 96 S.Ct. 933, 938–39, 47 L.Ed.2d 43; *New York State Dep't of Social Services v. Dublino*, 1973, 413 U.S. 405, 415, 93 S.Ct. 2507, 2514, 37 L.Ed.2d 688. There is no presumption when, as here, state law has its

---

7. *Conference of Federal Savings & Loan Assn's v. Stein*, 9 Cir., 1979, 604 F.2d 1256, *aff'd mem.*, 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754, held only that because of the substantial federal regulation, state-conferred rights could not be enforced against the association by a state regulatory body. It left open whether such rights could be enforced in a private lawsuit.

effect in an area which was "a merely peripheral concern of the [federal regulation]," *De Canas v. Bica,* ante, 424 U.S. at 361, 96 S.Ct. at 939 (quoting *San Diego Unions v. Garmon,* 1959, 359 U.S. 236, 243, 79 S.Ct. 773, 778, 3 L.Ed.2d 775); *Derenco, Inc. v. Benjamin Franklin Savings & Loan Ass'n,* 1978, 281 Or. 533, 577 P.2d 477, 484, *cert. denied,* 439 U.S. 1051, 99 S.Ct. 733, 58 L.Ed.2d 712. Rather, defendant should have an affirmative burden to show inconsistency, or at least a possibility of conflict. A review of the regulations, 12 C.F.R. §§ 500.1–556, shows no such, either in the area of proscribed unfair or deceptive practices generally, or as to such traditionally state-regulated banking matters as set-offs, debt collection and foreclosures. Indeed, until July 23, 1979, when Congress enacted P.L. 96–37, amending section 57A of the Federal Trade Commission Act, 15 U.S.C. §§ 41–58, prime responsibility for regulating unfair or deceptive acts or practices by the associations rested not with the Home Loan Bank Board, but with the Federal Trade Commission. *See* H.R.Rep.No.265, 96th Cong., 1st Sess., [1979] U.S.Code Cong. & Adm.News 372.

 The remaining question with respect to possible federal preemption is whether the state statute, by allowing double or treble damages, imposes an undue burden on the operations of federal savings and loan associations in Massachusetts. I conclude that in the context of the present case it does not. Although they are instruments of the federal government, the associations are privately owned corporations, aiming to make a profit. As such, they should comply with the business usages and ethics required of others engaged in similar businesses within the state unless such usages and ethics actually conflict or interfere with federal purposes or unless Congress or the federal regulatory body unmistakably indicates otherwise." *Derenco, Inc.,* ante, 577 P.2d at 487. Here, as evidenced by 15 U.S.C. § 57a(f)(1), the state and federal

purposes coincide rather than conflict. An award of Chapter 93A exemplary damages against defendant would no more threaten the ability of federal savings and loan associations to perform their functions in the Commonwealth than it would state-chartered savings and loan associations, or other corporations subject to the statute.

### Cynthia

#### Chapter 93A

With the exception of the delayed auto loan, already disposed of as not pleaded, all of plaintiffs' Chapter 93A claims arose prior to the statute's amendment, effective October, 1979. Cynthia has no claims under section 9 as it then read, having been a mere borrower of money, and not a purchaser or lessor of goods, services or property. *Murphy v. Charlestown Savings Bank,* 1980, 380 Mass. 738, Mass.Adv.Sh. 1323, 405 N.E.2d 954. Since the jury found her not to be a joint venturer in the filling station business with Allen, neither can she qualify under section 11, which would require her to have been "engage[d] in the conduct of any trade or commerce."

### Allen

#### Chapter 93A

 Allen's claims are governed by section 11, rather than section 9, because defendant's recoverable unfair acts arose during, and in connection with, Allen's operation of the gasoline station. To establish his claims under section 11, he must show that each unfair act for which he seeks recovery caused him "loss of money or property." *Baldassari v. Public Finance Trust,* 1975, 369 Mass. 33, 337 N.E.2d 701. I find this requirement met with respect to the four acts for which the jury awarded damages. Adding the bad check indebtedness to the mortgage resulted in excess interest charges.[8] Improperly freezing the Now account, without notice, likewise led to excess interest charges, and also may have

---

8. Although in this instance, and others, the excess charges were not actually paid, I do not deem that controlling in determining loss of money or property, especially considering that defendant has continued to claim them in this

litigation. *Cf. Wolfberg v. Hunter,* 1982, 385 Mass. 390, 432 N.E.2d 467 (awarding tenant diminution in rental value of premises, even though rent was withheld pending litigation).

led, ultimately, to a reduction in Allen's credit sales. The wrongful institution of foreclosure proceedings, if nothing else, resulted in unjustified charges by defendant of its costs and attorney's fees. Finally, defendant's refusal to allow refinancing through the Wareham bank denied plaintiffs the use of a sum of money well in excess of their mortgage with defendant—a loss of money in the purest sense.

Having met all the preliminary statutory requirements, and having proven that the four acts were unfair or deceptive within the meaning of the statute, see *PMP Associates, Inc. v. Globe Newspaper Co.*, 1975, 366 Mass. 593, 596, 321 N.E.2d 915, Allen is entitled to attorney's fees and double his "actual damages."

## Emotional Damages

At the time of trial there was uncertainty whether the statute's use of the term "actual damages" was broad enough to permit the recovery of emotional damages. Hence, as to some claims I put separate questions to the jury: actual damages—defined to be all except mental, and mental damages—defined to cover emotional. Since then the Massachusetts court has furnished more definite answers, unfavorable to such recovery. In *Wolfberg v. Hunter*, 1982, 385 Mass. 390, 432 N.E.2d 467, a tenant sought damages from his landlord for diminution in the value of the tenancy by failure to cure rodent infestation, and emotional distress so caused. The Housing Court found the former (although, it developed, on an erroneous theory) but denied the latter. It held that since it found no intentional or reckless conduct sufficient to support a common law tort, there was no enlargement under Chapter 93A.

On appeal, the court affirmed the denial of recovery at common law in light of the finding of no intentional or reckless infliction of emotional distress. It also affirmed the denial under Chapter 93A. Although the tenant had met the statutory language, and had proved a "loss of money or property," liability was held to stop there

under the statute, even though emotional damages were also caused. The court's language and reasoning does not suggest that there is an exception, as plaintiff would have it, for cases unlike *Wolfberg*, where mental damages could be recovered at common law. Therefore, even if in some instances Allen may have shown himself entitled to recover damages for emotional distress at common law, such are not to be included in assessing Chapter 93A liability. Only the award of $2,020.73, representing the actual damages for the freezing of the Now account is to be doubled.[9]

### SUMMARY

| | Allen | | Cynthia |
|-------|-------|-------|-------|
| | Common Law | Chapter 93A | Common Law |
| Item 1 | $ 1 | 0 | $ 1 |
| Item 2 | $ 2,200 | $ 4,041 | 0 |
| Item 3 | $ 3,250 | 0 | $ 3,250 |
| Item 4 | $ 1,100 | 0 | $ 1,100 |
| | $ 6,551 | $ 4,041 | |
| | 4,041 | | |
| | $ 10,592 | | $ 4,351 |

## Miscellany

Plaintiffs also claim that defendant improperly compounded interest on the 1972 mortgage note, resulting in charges substantially in excess of those contracted for. Defendant admits that it charged interest on interest, but says it did so only when plaintiffs' payments were delinquent, and cites the following provision of the note:

"[O]n a loan which is delinquent by reason of the nonpayment of any sum due the Association there may be charged an additional rate of interest but such additional charge shall not exceed a per annum rate of one-half of one per cent of the unpaid balance of the loan for the period of delinquency."

Purportedly pursuant to this provision, defendant, as shown by the mortgage book, charged 9.5 per cent interest on both unpaid principal and unpaid interest, whenever the Morses missed a monthly payment. The

---

**9.** *Kohl v. Silver Lake Motors, Inc.*, 1976, 369 Mass. 795, 801, 343 N.E.2d 375, seems to preclude the doubling of the undetermined "lawyer's fee," ante, which might otherwise qualify as loss of money under the statute.

note explicitly provides, however, that the basic per annum interest rate of 9 per cent is to be charged only "on unpaid principal." When defendant charged interest on interest during periods of delinquency it would appear to have been exceeding the maximum per annum charge permitted by the note.

At the same time, plaintiffs grossly exaggerate the effect of this practice. At least prior to March 1979, there was no continual compounding of interest; it occurred only during months when plaintiffs failed to make a payment. As soon as the delinquent payment was made, the interest that has been added to the principal would, in effect, be subtracted therefrom. Without taking space to repeat the calculations, this occurred some twenty-five times, with an overcharge of about $ .55 each time, or roughly $15 total.

*Counsel Fees*

 Chapter 93A § 11 as applicable to Allen's claims provides for counsel fees. The amount will be determined after hearing, but some guidelines are presently in order. Obviously no fees will be allowed for prosecuting the federal claims, as to which the file indicates that much time was devoted, and no fees will be allowed on account of Cynthia, who proved no Chapter 93A liability. The burden on Allen to establish his fees must include the burden fairly to separate out that portion properly attributable to his successful Chapter 93A claims.[10] On the other hand, where some particular matter gave rise to common law as well as Chapter 93A liability, this should result in no apportionment or reduction of charges, and even where Chapter 93A liability was established but no damages proven a fee is recoverable. *Raymer v. Bay State Nat'l Bank*, ante.

 Two questions remain. The statute provides that plaintiff shall, "irrespective of the amount in controversy, be awarded reasonable attorneys' fees."

While this means the amount in controversy is not controlling, I have never heard of determining a reasonable fee without paying some regard to what was involved. The legislature, for example, cannot be thought to have intended that, simply because a plaintiff has a legitimate, but modest, Chapter 93A claim counsel could proceed as though conducting a multimillion dollar class action. A "reasonable" fee requires some relationship between the depth of the services provided and what is at stake. Furthermore, the amount in controversy means the amount reasonably in controversy. Passing the fact that Cynthia sought punitive damages of $500,000, or 1 per cent of defendant's net worth, whichever was greater, for each of the two federal claims that she represented as a class action (with which we are not now concerned), she sought $125,000, to be tripled, for each of separate alleged violations of Chapter 93A; Allen sought $250,000 each, also to be tripled.[11] Thus, for example, Cynthia claimed that she was wronged by defendant's dishonoring checks on "Cynthia's [Now] account" in order to force payment of the March 15 note; "freezing" the account; the defaming her by "refusing to honor the checks drawn on her account," as three separate claims, each entitling her to damages of $125,000, tripled; *i.e.*, $375,000 damages, before tripling, for a wife whose name was on a $2,000 joint checking account on which the husband drew all the checks.

A manifest purpose of Chapter 93A as shown therein is that the parties promptly undertake to reach a reasonable settlement. In the present case one cannot help wondering what defendant would wish to enter into negotiations with counsel who, whether or not mindful of F.R.Civ.P. Rule 11's obligation "that to the best of his knowledge, information, and belief there is good ground to support [the pleading]," commences with such concepts.

---

**10.** Of course, most of the time spent on Chapter 93A liability would have been necessary even had Allen sued alone. Only work unnecessary as to Allen is to be separated out.

**11.** Notwithstanding this disintegrated approach, plaintiffs complained that submitting individual claims to the jury limited them by depriving them of aggregate damages, on the theory that the whole was greater than a sum of the parts. *See* n. 6, ante.

In spite of all this, this was a difficult case, requiring considerable time; the amount involved under Chapter 93A could originally be thought to include emotional damages, and there was also involved the possible loss of plaintiffs' house on foreclosure. A substantial fee will be in order.

 Finally, there is a question whether to proceed under federal, or state methods in determining the fee. If the two methods would lead to the same result, it would make no difference which was followed; if they would lead to different results, that would seem to reflect different policy judgments. This being a state statute, the state policy should prevail. Basically the state route will be followed.