HANOVER INSURANCE COMPANY *vs.* JOHN SUTTON & others.[1]

No. 97-P-0657.

Suffolk. June 5, 1998. - January 15, 1999.

Present: ARMSTRONG, JACOBS, DREBEN, & FLANNERY, JJ.[2]

*Practice, Civil,* Judicial discretion, Discovery, Instructions to jury, Judgment notwithstanding verdict, Directed verdict, Declaratory proceeding. *Protective Order. Fiduciary. Corporation,* Officers and agents, Corporate opportunity. *Damages,* Restitution, Loss of profits. *Consumer Protection Act,* Damages, Trade or commerce, Attorney's fees, Unfair or deceptive act.

A Superior Court judge properly, in the circumstances of a civil action, scheduled an early trial date and held a trial within two months of the filing of the complaint. [159-160]

A Superior Court judge's order limiting discovery in a civil action was erroneous in light of the allegations in one count of the complaint, and the matter was remanded for discovery concerning events relative to that count and a new trial if appropriate. [160-162]

At the trial of a civil action, there was no error in the judge's protective order limiting the disclosure of certain confidential materials. [162-163]

At the trial of a claim for breach of fiduciary duty, the judge's instructions adequately addressed the elements of the claim. [163-164]

In a claim for breach of fiduciary duty, the judge correctly allowed the plaintiff's motion for judgment notwithstanding the verdict, where the evidence supported the judge's action and no reasonable inference could otherwise be drawn than in favor of the plaintiff [165-171], and there was no error in the judge's award of nominal damages [171-172].

In a claim for violation of G. L. c. 93A, § 11, the judge's findings supported his finding of liability, and there was no error in the judge's award of nominal damages [172-175] or in his award of attorneys' fees [175-177].

In a civil action in which the plaintiff sought, inter alia, declaratory relief with respect to a breach of fiduciary duty, there was no error in the judge's grant of relief by imposition of a constructive trust on one of the defendants who had improperly diverted a business opportunity for his own benefit and to the detriment of the plaintiff. [177-178]

---

[1]William J. O'Brien; William J. O'Brien, Inc.; and Insurance Partnerships, Inc.

[2]This opinion, except section 4, was written by Justice Flannery before his death. Section 4 was written by Justice Dreben. Justice Armstrong was added to the panel for section 4, pursuant to Mass.R.A.P. 24(a), 365 Mass. 872 (1974).

Claims under G. L. c. 93A were remanded for further findings. [178-179]

CIVIL ACTION commenced in the Superior Court Department on December 16, 1994.

The case was tried before *David M. Roseman*, J., and a motion for a new trial was considered by him.

*Owen Gallagher* for the plaintiff.

*Richard W. Renehan* (*Brian Linehan* with him) for the defendants.

FLANNERY, J. On December 16, 1994, the plaintiff, Hanover Insurance Company (Hanover), filed an eight-count complaint against the defendants, John Sutton, William J. O'Brien, William J. O'Brien, Inc., and Insurance Partnerships, Inc. (IPI).[3] The gravamen of the complaint was that Sutton, Hanover's former employee, failed in his fiduciary duty to Hanover by diverting a corporate opportunity.

On February 13, 1995, a jury trial commenced on Hanover's original complaint.[4] Before the case went to the jury, Hanover amended its complaint to add three additional counts.[5] On March 1, 1995, verdicts were returned for the defendants on all claims submitted to the jury, which were counts I, IV, VI and XI.

Hanover moved for judgment notwithstanding the verdict. The motion was allowed as to count I based on Sutton's breach of his duty to disclose a corporate opportunity. See Mass.R.

---

[3]The complaint contained the following counts: I, breach of fiduciary duty against Sutton; II, deceit against Sutton; III, G. L. c. 93A against IPI, for its own acts and for the acts of its agent, Sutton; IV, money had and received against IPI; V, declaratory judgment against Sutton for loss of corporate opportunity; VI, interference with contractual relations against William J. O'Brien, Inc., and IPI; VII, G. L. c. 93A against IPI and William J. O'Brien, Inc., for interference with contractual relations; and VIII, injunctive relief and specific performance against William J. O'Brien.

[4]The judge initially ordered a jury trial on counts III (which he later removed from the jury's consideration), IV, VI, and VII (also later removed from the jury). On the fourth day of trial, the judge expanded the submissions to the jury to include counts I and II. The parties later agreed to dismiss count II with prejudice and without costs.

[5]The amended complaint included the following additional counts which are not involved in this appeal: IX, interference with contractual relations against Sutton, William J. O'Brien, Inc., and IPI; X, interference with prospective contractual relations against Sutton, William J. O'Brien, Inc., and IPI; and XI, interference with advantageous relations against Sutton, William J. O'Brien, Inc., and IPI.

Civ.P. 50(b), 365 Mass. 814-815 (1974). The judge, however, ruled that the amount of damages was uncertain and awarded nominal damages of $1.00. Hanover moved for a new trial on the issue of damages, which was denied. See Mass.R.Civ.P. 59(a), 365 Mass. 827 (1974). On the same basis as his ruling on count I, the judge ruled in favor of Hanover on count V.[6]

On May 9, 1996, judgment entered for the plaintiff on counts I and V and for the defendants on all the remaining counts except count III which was reserved pending a hearing on attorneys' fees.

On February 18, 1997, judgment entered in favor of Hanover on count III, on a finding that IPI violated G. L. c. 93A, § 11, by aiding and abetting Sutton's breach of fiduciary duty. The judge awarded Hanover $1.00 in nominal damages and $168,154.04 in attorneys' fees and costs.

Both Hanover and the defendants, Sutton, O'Brien, IPI, and William J. O'Brien, Inc., appeal. We address, in turn, the issues on appeal: (1) Hanover's contention that it was denied a fair trial because of an accelerated trial date, discovery restrictions, and an unfair protective order; (2) the judge's instructions to the jury on count I; (3) Sutton's liability to Hanover on count I for breach of fiduciary duty; (4) the judge's denial of a jury trial on damages after granting judgment notwithstanding the verdict on count I; (5) IPI's liability to Hanover on count III for engaging in practices that violated G. L. c. 93A; (6) Hanover's contention that the judge erred in finding only nominal damages on count III; (7) the award of attorneys' fees on count III; (8) Sutton's liability to Hanover on count V for loss of corporate opportunity; and (9) the adequacy of the judge's findings of fact and conclusions of law on count VII.

1. *Background.* We summarize the facts.[7] The Hanover Insur-

---

[6]The judge ordered, in part, that Sutton, as trustee, hold in a constructive trust for the benefit of Hanover (1) 1,861 shares of common stock in IPI, now known as the Covenant Group, Inc., purchased by Sutton for $18,610 on May 24, 1994; and (2) an option to purchase 2,791.5 shares of the common stock in IPI, now known as the Covenant Group, Inc., granted to Sutton, his heirs, and assigns on May 24, 1994. IPI was also enjoined from allowing Sutton to alienate his shares.

[7]As much of our review focuses on the judge's allowance of Hanover's motion for judgment notwithstanding the verdict on count I, we summarize the evidence in the light most favorable to the party prevailing at trial. See *Whitehall Co.* v. *Barletta*, 404 Mass. 497, 504 (1989).

ance Company is a national property and casualty insurance company headquartered in Worcester. William J. O'Brien was the president of Hanover from 1979 until he resigned in December, 1991.[8] Upon resignation, O'Brien entered into a severance agreement with Hanover. The agreement stated in part:

> "For the period January 1, 1992 through December 31, 1994 (the "Consultation Period"), you agree to be available to provide consulting, advisory and related services to Hanover and/or its subsidiaries as may be reasonably requested from time to time by the Chairman of the Hanover Board of Directors . . . .

> "For the Consultation Period, you agree not to directly or indirectly solicit the insurance business of any insured of Hanover and/or its subsidiaries or assist any other person to do so or solicit, recruit or assist or encourage a third party to solicit or recruit the services of any current employee, agent or broker of Hanover and/or its subsidiaries."

John Sutton was hired by Hanover in December, 1976, as associate counsel. He held that position until 1980 or 1981 when he was elected vice-president, general counsel, and corporate secretary. In May, 1990, O'Brien appointed Sutton president of a local operating company called Hanover Metro, Inc., in New Jersey. Hanover Metro, Inc., Hanover's second largest operating company, was a full-service operation which was responsible for New Jersey, Pennsylvania, and what Hanover deemed "down state New York."

After Sutton's mentor and personal friend, O'Brien, resigned from Hanover, Sutton began considering his professional future. Sutton discussed with John Kittel,[9] Hanover's vice-president of marketing and strategic development, the notion of entering a property and casualty insurance business venture. Sutton envisioned establishing a business enterprise to link local insurance companies. The network of local companies would consist of existing agencies with established "books of business."

---

[8] Theodore J. Rupley succeeded O'Brien as president and chief executive officer of Hanover.

[9] Kittel left Hanover in 1993, when Sutton was still working for Hanover in New Jersey.

Those books of business would be acquired and underwritten by a single company.

Sutton and Kittel approached Joseph Grochmal, a principal of Northington Partners, Inc. (Northington), a Connecticut-based investment banking and venture capital firm specializing in the insurance industry, about raising capital for their business venture. At Grochmal's request, Sutton and Kittel prepared a writing of their business plan, which was completed in September, 1992. After reviewing the plan, Northington embarked on an effort to raise funds for the venture.

In November, 1992, Sutton and Kittel incorporated themselves as Sutton, Kittel & Associates, Inc. (SKA). Sutton and Kittel were SKA's only directors and shareholders; its officers were Kittel, Sutton, and Sutton's wife, a lawyer who served as the corporate secretary and handled all the necessary corporate filings.

The same day SKA was incorporated, O'Brien incorporated William J. O'Brien, Inc. Thereafter, on November 23, 1992, SKA and William J. O'Brien, Inc., executed an agreement by which William J. O'Brien, Inc., would provide consulting services to SKA.[10]

In January, 1993, Hanover's new president, Rupley, met with Sutton to discuss Sutton's being promoted to a position in Hanover's home office. Sutton accepted Rupley's offer in May, 1993. Sutton testified that he did not tell Rupley that he was working on any outside insurance business or that he had formed SKA. He said he told Rupley that, in all fairness, Rupley should know that he had been talking with investment bankers about raising money for a potential new business opportunity.

In March, 1993, Grochmal learned that the Covenant Mutual Insurance Company (Covenant), a long-standing Connecticut mutual insurance company, had been placed in receivership because of disastrous losses caused by Hurricane Andrew in Florida. Grochmal and Northington pursued the possible acquisition of Covenant for the benefit of SKA. Northington's intent, which was known to Sutton, was to acquire Covenant and then implement Sutton and Kittel's plan to establish a network of local property and casualty insurance companies.

---

[10]Sutton testified that SKA signed a consulting agreement with William J. O'Brien, Inc., so that in the event Sutton and Kittel embarked on the "endeavor to raise capital to go into the insurance business," William J. O'Brien, Inc., would serve as a consultant to SKA in that endeavor.

In furtherance of these ends, Grochmal met with the Connecticut Insurance Commissioner to discuss the possible acquisition. Grochmal and Northington also prepared a detailed business plan, dated July 21, 1993, which outlined the financial and corporate structure for the possible acquisition of Covenant by a new company, Insurance Partnerships, Inc. (IPI). The plan listed O'Brien as chairman, Sutton as president, and Kittel as chief operating officer of IPI. IPI's principal business according to the plan

> "will be to act as the holding company for a network of property-casualty insurance companies. IPI has targeted the 162-year old Covenant Mutual Insurance Company ('Covenant') as the first company in this network and has worked closely with the Connecticut Insurance Department to develop a structure designed to rehabilitate Covenant.

> "IPI anticipates acquiring the 31-state licenses and charter of Covenant exclusive of all current assets and liabilities of the company. In return for these licenses and the charter, IPI will contribute $1 million and 1% of its common stock to the Liquidating Trust established by the Connecticut Insurance Department for disposal of the liabilities of Covenant. IPI expects to build Covenant through the acquisition of profitable agency blocks of business or agencies and to develop Covenant into a captive agency underwriter with significant expense and marketing advantages versus its competitors. IPI will focus on personal lines and small-case coverages produced by its agents."

On August 2, 1993, Northington executed a letter of intent with the Connecticut Insurance Department for the proposed restructuring and acquisition of Covenant. The letter of intent was signed by Northington on behalf of IPI, a "to-be-formed" corporation.

By March, 1994, Covenant was converted from a mutual company to a stock company, thereby allowing IPI to buy its stock. The to-be-formed entity, IPI, was needed in order to acquire the stock of Covenant. Instead of incorporating a new entity, however, Northington's lawyers elected to use SKA which, by name change, became IPI. IPI executed a definitive

stock purchase agreement with one Googins[11] for the right to purchase all of Covenant's capital stock, subject to court approval and IPI's securing appropriate financing.

On March 18, 1994, Sutton and Kittel entered into employment agreements with IPI to become part of the company's management team. On May 4, 1994, the demutualization of Covenant was confirmed by the Connecticut Superior Court. Northington invested $2 million in IPI; other investors procured by Northington put in $5 million; and IPI borrowed $4 million. Sutton bought 1,861 shares of common stock in IPI for $18,610; another 2,791 shares were allocated to him by option. On May 25, 1994, IPI's acquisition of Covenant was completed.

On May 26, 1994, Sutton notified Hanover of his resignation from the position of vice president at Hanover, and all other positions that he held with companies affiliated with Hanover, to be effective on June 25, 1994.

Hanover filed the present suit against Sutton, IPI, O'Brien, and William J. O'Brien, Inc., on December 16, 1994.

2. *Accelerated trial date, limited discovery, and protective order.* Hanover argues that it was denied a fair trial because the trial judge abused his discretion by scheduling an early trial date, restricting discovery, and issuing a protective order. We agree in part.

The scheduling of trial and the conduct and scope of discovery and protective orders are issues within the sound discretion of the motion or trial judge. See *Fontaine* v. *Ebtec Corp.*, 415 Mass. 309, 316 (1993) (scheduling); *Solimene* v. *B. Grauel & Co., KG*, 399 Mass. 790, 799 (1987) (discovery); *Cronin* v. *Strayer*, 392 Mass. 525, 534 (1984) (protective order). See also *Greenleaf* v. *Massachusetts Bay Transp. Authy.*, 22 Mass. App. Ct. 426, 429 (1986), and cases cited (trial judge's discretion with regard to case management not abused "unless . . . arbitrary . . . , capricious . . . , whimsical . . . , or idiosyncratic"). We hold these standards in mind as we review each claimed error.

a. *Accelerated trial date.* On December 16, 1994, Hanover filed the original complaint against the defendants. On December 21, 1994, the defendants brought a joint emergency

---

[11]The agreement listed Googins as Insurance Commissioner of the State of Connecticut in his capacity as rehabilitator of Covenant and as trustee of the Covenant Liquidating Trust.

motion for summary judgment.[12] The judge heard this motion on January 4, 1995, and scheduled the trial to begin on January 23, 1995. On January 23, 1995, the judge allowed Hanover's motion to continue the trial, setting it for February 6, 1995. The trial did not begin, however, until February 13, 1995.

We see no abuse of discretion in scheduling an early trial date under the circumstances of this case. First, the judge may have been concerned (as the defendants argued in their emergency motion) that Hanover's complaint was an effort by a potential competitor to squelch competition and, therefore, any delay could cause irreparable harm to a start-up venture. Moreover, as the defendants state, Hanover precipitated the speedy trial by demanding several forms of equitable relief in its complaint, including preliminary injunctions against the business activities of O'Brien, Sutton, and IPI. Accordingly, an expedited resolution of Hanover's complaint protected the interests of all parties. See Mass.R.Civ.P. 65(b)(2), 365 Mass. 833 (1974).[13]

b. *Limitation on discovery.* Hanover next argues that the

---

[12]In support of their request for an expedited emergency hearing date, the defendants argued:

> "IPI is a new business and is presently involved in ongoing discussions with potential investors and lenders. . . . In particular, IPI is at a critical juncture in its efforts to conclude with a prospective investor its start-up funding and expects to do so by January 13, 1995. . . . The pendency of this lawsuit was disclosed to this prospective investor yesterday and the investor asked for copies of the papers in this action to be sent to it immediately. . . . We believe that this lawsuit jeopardizes IPI's ability to complete its start-up funding transactions. In addition, IPI is involved in multiple negotiations with insurance agents and this lawsuit will likewise have a negative impact on those agents' willingness to do business with IPI.

> "This lawsuit is thus having an immediate injurious impact upon IPI's business. . . . An immediate hearing is necessary to prevent the irreparable harm that the lawsuit will cause to IPI's business and reputation if it is left pending."

[13]Massachusetts Rule of Civil Procedure 65(b)(2), entitled Consolidation of Hearing with Trial on Merits, provides in pertinent part:

> "Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application."

judge erred by limiting the discovery of information in the possession, custody, or control of the defendants or third party witnesses to events occurring before June, 1994.[14] Hanover maintains that this order was prejudicial because count VI alleged that IPI and William J. O'Brien, Inc., interfered with Hanover's three-year nonsolicitation agreement with O'Brien, which did not expire until December 31, 1994.[15] Therefore, preventing Hanover from discovering information about events between June and December hindered its ability to explore this claim. We agree.

"While discovery orders are reviewable on appeal from entry of a final judgment, we do not interfere with the judge's exercise of discretion in the absence of a showing of prejudicial error resulting from an abuse of discretion." *Solimene* v. *B. Grauel & Co., KG,* 399 Mass. at 799. Hanover has made such a showing here. The limitation on discovery to events before June, 1994, was error in view of the allegations concerning Hanover's nonsolicitation agreement with O'Brien, which did not end until December, 1994. Accordingly, we remand the case for discovery concerning events relevant to count VI (and VII, see *infra* section 6) from June 1 through December 31, 1994. If warranted by such discovery, the trial judge shall set aside the verdict and grant a new trial on count VI. If nothing material took place

[14]Hanover notes (and the defendants do not dispute) that the stated reason for this restriction was that Sutton was no longer employed by Hanover after June, 1994.

[15]Prior to trial, in its motion to continue the trial and request that the matter be conformed to the tracking order issued by the court, Hanover argued that the discovery limitation was unduly and unfairly prejudicial. In support of its assertion that the June, 1994, cutoff date was prejudicial, Hanover stated:

> "William J. O'Brien had signed a non-solicitation agreement which was in effect through December 31, 1994. Moreover, the discovery produced thus far suggests that shortly after June, 1994 there were negotiations and further business plans which evidence, describe, relate and pertain to the conduct of John Sutton and William O'Brien prior to June 1994. . . . The information concerning the efforts of John Sutton and William O'Brien between June 1994 and the present are both relevant, material and likely to lead to the discovery of relevant and material information, and as such, this information is well within the bounds of permissible discovery pursuant to Rule 26 of the Massachusetts Rules of Civil Procedure."

On February 8, 1995, the judge denied Hanover's motion.

between June and December, the verdict on count VI shall stand.

c. *Protective order.* On January 19, 1995, the judge issued a protective order which governed the handling of all documents, testimony, and other information filed during discovery and other proceedings in the action. The order provided that confidential material could be used only for the purpose of preparing for and conducting the action and not for any business or other purpose. The order limited the disclosure of the confidential material to specific individuals named in the order.

On appeal, Hanover argues among other things that the reach of the protective order, at least as it related to expert witnesses, was error.[16] Hanover's counsel sought leave to show confidential material to expert witnesses if they were advised of the protective order. The judge responded, "No. No. Leave experts out of it at this point. Leave experts out. It seems to me that if we proceed with damages we will have time to show experts this information. Then I can measure actually what we are talking about." Hanover's counsel did not object to the ruling at that point.

On the fifth day of trial, the issue came up again. The judge allowed the experts to examine the material, saying:

> "I have responsibilities to these people and I'm not going to keep them and their public responsibilities ad infinitum. But I am going to give you hopefully a fair opportunity to use whatever exhibits that are in this case for the preparation of your damage testimony. So your expert may now have access to all such exhibits. If you wish to make copies of them, you may do so. The originals will remain in this court.

> "To that extent, your expert will be free to use all exhibits free of all restrictions, except [for] two exhibits that I have been contemplating [referring to two exhibits by number]. And as to that, his examination will [be] considered to be under the so-called protective order or confidentiality order.

---

[16]Hanover also argues that the defendants failed to produce pertinent discovery and that certain witnesses refused to answer questions at their depositions as a result of the protective order. However, the order stated that any challenge to the designation of confidential material which could not be informally resolved should be brought before the court for an appropriate ruling. Hanover did not avail itself of this option.

The question of disclosure will come, if raised, at the time the question is put to him."

Hanover did not object to the lateness of the ruling. Assuming without deciding that Hanover preserved this issue for appeal, we find no error. The protective order was issued as an exercise of the judge's discretion to protect the defendants from Hanover's request for information regarding their development of business contacts and other competitively sensitive documents. See Mass.R.Civ.P. 26(c), as amended, 423 Mass. 1401 (1996). Moreover, there was no harm to Hanover from the protective order as the judge ultimately permitted Hanover's expert witnesses to review the confidential information prior to testifying. No prejudice was shown from the delay in their viewing this information.

3. *Count I — Breach of fiduciary duty against Sutton.*

a. *Fiduciary duty instruction.* Hanover claimed against Sutton for breach of fiduciary duty, alleging that during Sutton's employment with Hanover he actively competed with Hanover, solicited Hanover's customers, and acted in his own interest to the detriment of Hanover. The jury found for Sutton.[17]

Hanover contends that the judge's erroneous charge on count I infected all the jury verdicts insofar as they related to Sutton's conduct. Specifically it claims error in the judge's refusal to instruct the jury that (1) notwithstanding the fact that an employee at-will can secretly prepare to compete with his employer, he cannot actively compete; and (2) an employee may not solicit the customers of his employer during his employment. These are correct statements of law. See *Chelsea Indus.* v. *Gaffney*, 389 Mass. 1, 11-12 (1983) ("an executive employee is barred from actively competing with his employer [during] the tenure of his employment, even in the absence of an express covenant"). See also *Augat, Inc.* v. *Aegis, Inc.*, 409 Mass. 165, 172-173 (1991) (an employee who plans to compete with his employer "may not appropriate his employer's trade secrets . . . solicit his employer's customers while still working for his employer . . . or carry away certain information, such as lists of customers"). "Every possible correct statement of law need not, however, be included in jury instructions if the

_____

[17]As previously mentioned, the judge granted Hanover's motion for judgment notwithstanding the verdict. The judge specifically limited his finding of a breach of fiduciary duty to Sutton's failure to disclose the Covenant opportunity to Hanover.

instructions as given are correct and touch on the fundamental elements of the claim." *Kobayashi* v. *Orion Ventures, Inc.*, 42 Mass. App. Ct. 492, 503-504 (1997), and cases cited.

The judge instructed as follows: "I have outlined on that board the four elements of the claim and those elements are: duty, and breach, and damage, and causation. And what I shall do is now discuss with you in more detail each of those four elements." The judge then proceeded to explain to the jury each of the elements.[18] We conclude his instructions adequately address each element of the claim and, therefore, find no error.

---

[18]Hanover alleges error in the judge's instruction concerning the elements of duty and breach. The judge's instructions on these elements were as follows:

"First, I begin by instructing you that Mr. Sutton's relationship with Hanover was that of an at-will employee. Those words have particular meaning in the law. At-will employee. An at-will employment relationship is terminable, can be ended by either the employee, in this case Mr. Sutton, or the employer, Hanover, without notice, for almost any reason or for no reason at all.

"I instruct you, however, that at all times on any of the issues before you that Mr. Sutton owed Hanover during his employment by Hanover the obligations of a fiduciary, or put another way, during the course of his employment by Hanover, he owed Hanover a fiduciary duty.

"A fiduciary duty, members of the jury, is a duty of the utmost good faith and loyalty. A fiduciary, such as Mr. Sutton in the course of his employment by Hanover, must consider in this case his Principal; that is, Hanover's welfare, and he must refrain, he must stop, he must not do any act for purely private gain. He, therefore, may not act out of avarice, that's greed, expediency or self-interest in derogation of his duty of loyalty to Hanover. He is obliged to consider Hanover's welfare, not merely his own.

"However, a fiduciary such as Mr. Sutton may plan to compete with the entity to which he owes allegiance, in this case Hanover, and may do so secretly, provided that in the course of such plans he does not otherwise act in violation of his fiduciary duty. Thus, making logistical arrangements for the establishment of a competing venture, whether called Sutton Kittel Associates or IPI, even if done in secret from Hanover, may be done without violating the fiduciary relationship.

"So in like vein, the entrance by Mr. Sutton into the Employment Agreement with IPI in November, 1994, while he owed Hanover a fiduciary duty arising out of his then employment by Hanover, does not in and of itself violate his fiduciary duty to Hanover unless Hanover

b. *Judgment notwithstanding the verdict.* After the jury returned a verdict in favor of Sutton on the breach of fiduciary duty claim,[19] Hanover moved for judgment notwithstanding the verdict, pursuant to Mass.R.Civ.P. 50(b). The judge allowed the

shows by a preponderance of the evidence that that transaction by Mr. Sutton caused harm to it.

"To reiterate. Mr. Sutton may plan his departure from Hanover and his interest in and employment by IPI in secret without violating his fiduciary duty to Hanover. Something more, the burden on which is Hanover's to prove by a preponderance of the evidence, is required. I, therefore, turn to the second element which is the element on that board of breach.

"Members of the jury, if a business opportunity is determined by you, the jury, to be a corporate opportunity, then a corporate fiduciary, in this case Mr. Sutton, may not take or usurp it for his own benefit unless proper consent is given. A corporate opportunity is thus as against a corporate fiduciary, such as Mr. Sutton, a corporate asset. Hence, when a business opportunity is that of a corporation, the corporate executive may not take it for himself or his new associates or business entity.

"I, therefore, instruct you that if Hanover has persuaded you by a preponderance of the evidence that Mr. Sutton learned of a business opportunity or opportunities which was or were within the scope of Hanover's activities and which was or were a present or potential advantage to Hanover, though not essential to Hanover's business, then as a matter of law Mr. Sutton was not permitted to seize such opportunity or opportunities without first presenting it or them to Hanover.

"Further, should you find by a preponderance of the evidence, the burden of which is on Hanover to prove, that Mr. Sutton seized such an opportunity or opportunities for himself or those you find associated with him without first determining whether it was an opportunity that Hanover wished to avail itself of, then you are to find that Mr. Sutton breached his fiduciary duty to Hanover."

[19]The jury answered "no" to each of the following special questions for the breach of fiduciary duty claim:

"1. Did Mr. Sutton breach his fiduciary duty to Hanover by

A. failing to disclose information concerning Covenant Mutual?

B. failing to disclose information concerning Carlson-Daniel?

C. signing an employment agreement with Insurance Partnerships, Inc. on March 18, 1994?

D. any other conduct?"

motion, insofar as it concerned Sutton's failure to disclose the Covenant opportunity to Hanover.[20]

"In reviewing the judge's allowance of the motion for judgment notwithstanding the verdict, we apply the same standard as we would apply for a review of a motion for directed verdict." *Service Publications, Inc.* v. *Goverman*, 396 Mass. 567, 571 (1986), citing *D'Annolfo* v. *Stoneham Hous. Authy.*, 375 Mass. 650, 657 (1978). See *O'Shaughnessy* v. *Besse*, 7 Mass. App. Ct. 727, 729 (1979). The general test is whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the [party prevailing at trial]." *Service Publications, Inc.*, *supra* at 571, quoting from *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978).

It can rarely be ruled as matter of law that the party having the burden of proof has sustained that burden. *J. Edmund & Co.* v. *Rosen*, 412 Mass. 572, 575 (1992). In allowing such motions, the Federal cases construing the analogous Fed.R.Civ.P. 50(b) (construction of analogous Federal rule may serve as a guide to construction of the Massachusetts rule, see *O'Shaughnessy* v. *Besse*, 7 Mass. App. Ct. at 728 n.2) state that the judge "must be able to say . . . there is insufficient evidence for permitting any different finding" (i.e., other than for the claimant). *Gatenby* v. *Altoona Aviation Corp.*, 407 F.2d 443, 446 (3d Cir. 1968), quoting from *Mihalchak* v. *American Dredging Co.*, 266 F.2d 875, 877 (3d Cir.), cert. denied, 361 U.S. 901 (1959). "The test is a strict one, and a directed verdict for the party having the burden of proof may be granted only where he has established his case by evidence that the jury would not be at liberty to disbelieve." *Hurd* v. *American Hoist & Derrick Co.*, 734 F.2d 495, 499 (10th Cir. 1984), quoting from *Service Auto Supply*

[20]There is no merit to Hanover's argument that it should have been granted a judgment notwithstanding the verdict for other alleged breaches of fiduciary duty. The judge found that Sutton had "no duty upon him to inform Hanover of his plans to join a venture which would compete with Hanover." Moreover, the judge stated that the law does not prohibit "Sutton from executing his logistical plan, or to put it more bluntly, his plan to form with others a new venture to compete with Hanover directly by raising funds, and he did not need in any respect Hanover's approval for that activity." Accordingly, the judge stated that "in large measure I have no quarrel with the jury findings insofar as I can assume it found as I have just stated when it answered no to the question of breach of fiduciary duty. But I do . . . find and rule that there was a duty upon Mr. Sutton to disclose the Covenant opportunity to Hanover and offer to it that opportunity before appropriating it for his own benefit."

*Co.* v. *Harte & Co.*, 533 F.2d 23, 25 (1st Cir. 1976). Such evidence is produced where the party's "own binding testimony precludes a verdict for him." *J. Edmund & Co.* v. *Rosen*, 412 Mass. at 575, quoting from Smith & Zobel, Rules Practice § 50.8 (1977). "A directed verdict for the party bearing the burden of proof may be granted only if the evidence is such that without weighing the credibility of the witnesses the only reasonable conclusion is in his favor." 734 F.2d at 499. See generally 9A Wright & Miller, Federal Practice & Procedure § 2535 (1995); Smith & Zobel, Rules Practice § 50.8(2) (1977).

The judge allowed Hanover's motion on the ground that Sutton had a duty to disclose the Covenant opportunity to Hanover before appropriating it for his own benefit, and he failed to do so. "The requirements that determine the propriety of pursuing corporate opportunities . . . [are] referred to . . . as the 'corporate opportunity doctrine.' " *Demoulas* v. *Demoulas Super Markets, Inc.*, 424 Mass. 501, 528 (1997). In applying the doctrine to the evidence in this case, we conclude that the result reached by the judge is supported by the evidence and that no reasonable inference could otherwise be drawn than in favor of Hanover.

The corporate opportunity doctrine is based on "the principle that corporate directors and officers are bound by their duty of loyalty to subordinate their self-interests to the well being of the corporation. A person who owes a fiduciary duty to a corporation is prohibited from taking, for personal benefit, an opportunity or advantage that belongs to the corporation." *Id.* at 529, citing 1 Cox & Hazen, Corporations § 11.7 (1995). "In selecting a test for determining which ventures rightfully belong to a corporation, and are subject to the corporate opportunity doctrine, the corporation deserves broad protection. Rather than limiting the doctrine's coverage only to those instances where the proposed venture is demonstrably similar to existing and prospective corporate activities, the focus is on the paramount obligations of the fiduciary." *Demoulas, supra* at 529.

In *Demoulas*, the court imposed a duty on the fiduciary to fully disclose to the corporation the corporate opportunity. "The disclosure requirement takes from the fiduciary the power to decide whether the opportunity . . . is in the corporation's interest and removes the temptation posed by 'a conflict between self-interest and integrity.' " *Id.* at 531, quoting from *Durfee* v. *Durfee & Canning, Inc.*, 323 Mass. 187, 198 (1948). See *Energy*

*Resources Corp.* v. *Porter*, 14 Mass. App. Ct. 296, 299-302 (1982). Accordingly, where the fiduciary discloses the corporate opportunity to the corporation, and the decision about whether the opportunity is in the corporation's best interest is made by disinterested members of the corporation rather than by the fiduciary, conflict may be avoided and fairness to the corporation better ensured. *Demoulas, supra* at 531. In sum, to satisfy a fiduciary's duty of loyalty, an officer who seeks to pursue a corporate opportunity must

> "first disclose material details of the venture to the corporation, and then either receive the assent of disinterested directors or shareholders, or otherwise prove that the decision is fair to the corporation. Otherwise, the officer . . . acts in violation of his fiduciary duties, and whatever gain or advantage that he acquires may be held for the benefit of the corporation so as to deny him any benefit or profit."

*Id.* at 533, and cases cited.

With this standard in mind, we next examine the corporate opportunity that the judge found was usurped in violation of Sutton's fiduciary duty to Hanover. As previously stated, the judge concluded that the Covenant opportunity represented a corporate opportunity that rightfully belonged to Hanover and was diverted from it in a breach of fiduciary duty. Covenant's status as a diverted corporate opportunity is based on the following evidence.

As previously summarized, Sutton and Kittel discussed the notion of establishing a business enterprise to link property and casualty insurance companies. Sutton and Kittel prepared a written proposal for establishing this business venture and, thereafter, incorporated themselves under the name Sutton, Kittel & Associates. After reviewing their proposal, Northington, where Grochmal was employed, agreed to try to raise capital to fund the proposal.

In March, 1993, after learning that Covenant was in receivership, Northington pursued the possible acquisition of Covenant for the benefit of Sutton and Kittel's business enterprise. Northington's intent was to acquire Covenant and then implement Sutton and Kittel's business plan by establishing a network of local property and casualty insurance companies.

In furtherance of these ends, Grochmal met with the Connecticut Insurance Commissioner to discuss the possible acquisition. On August 2, 1993, Northington executed a letter of intent with the Connecticut Insurance Department for the proposed restructuring and acquisition of Covenant. The letter of intent was signed by Northington on behalf of IPI, a to-be-formed corporation.[21] By March, 1994, Covenant was converted from a mutual company to a stock company, thereby allowing IPI to purchase the stock of Covenant.

In granting judgment notwithstanding the verdict, the judge stated that he inferred from the evidence that Sutton had the level of knowledge concerning the Covenant opportunity that was detailed and analyzed in the IPI business plan and had the duty to disclose this opportunity to Hanover with that degree of specificity. Sutton, however, testified that he did not believe that he saw the plan. Hence it could be inferred that he might not have known the level of detail contained therein. The defendants, therefore, argue that the judge erred in the inference he drew. We agree that the judge's inference in favor of the moving party was improper. See *Moose* v. *Massachusetts Inst. of Technology*, 43 Mass. App. Ct. 420, 421 (1997), quoting from *Conway* v. *Smerling*, 37 Mass. App. Ct. 1, 3 (1994) ("[e]vidence that contradicts the testimony of the nonmoving party is to be ignored" when ruling on a motion for judgment notwithstanding the verdict). See also *Cherick Distribs., Inc.* v. *Polar Corp.*, 41 Mass. App. Ct. 125, 126 (1996). However, we conclude, from Sutton's own testimony, that even if he did not have the level of knowledge inferred by the judge, he had sufficient knowledge of the Covenant opportunity to require disclosure to Hanover before diverting it for his own benefit. Sutton testified that he knew that Northington, the company working with him on his proposed business venture, was attempting to acquire Covenant when it went into receivership. He further stated that Northington made him aware of its intent to acquire the company and then implement the plan he and Kittel had

---

[21]Northington prepared a detailed business plan, dated July 21, 1993, which outlined the financial and corporate structure for the possible acquisition of Covenant by IPI. See *supra* section 1. The plan, which was based in large measure on Sutton's proposal, listed O'Brien as chairman, Sutton as president, and Kittel as chief operating officer of IPI.

drafted.[22] Sutton's testimony as to his own knowledge is binding on him. *McFaden* v. *Nordblom,* 307 Mass. 574, 575 (1940). *Maldonado* v. *Thomson Natl. Press Co.,* 16 Mass. App. Ct. 911, 912 (1983).

The defendants further argue that the Covenant situation was not a corporate opportunity that Hanover would have pursued. However, "the existence of a[n] . . . impediment is a matter for a corporation's board to consider when deciding whether to accept or decline an opportunity that has been disclosed to it, and the existence of any impediment does not excuse the failure of a fiduciary to present the opportunity to the board . . . .[23] [B]ecause full disclosure did not occur here, we do not need to address whether [Hanover] could have feasibly pursued [the Covenant opportunity]. The nondisclosure of a corporate opportunity is, in itself, unfair to a corporation and a breach of fiduciary duty."[24] *Demoulas, supra* at 534-535.

Accordingly, considering the evidence with all reasonable

---

[22]Although it was Northington, rather than Sutton, who directly participated in the negotiations to acquire Covenant, Sutton knew that Northington was pursuing the Covenant opportunity for his (Sutton's) benefit. Therefore, the defendants' argument that it was Northington, not Sutton, that seized the corporate opportunity is without merit. Compare *Demoulas,* 424 Mass. at 535.

[23]We note that even though the law clearly takes from Sutton the decision whether the opportunity would be of interest to Hanover, the evidence suggests that the Covenant opportunity was a business endeavor that Sutton knew might be of interest to Hanover. Sutton testified that he was a member of a special committee at Hanover that explored entering the market for group property and casualty insurance. Moreover, Sutton was sent a memorandum discussing concepts that Hanover was exploring with respect to establishing a group property and casualty business. The memorandum stated in part: "The cleanest and most efficient way to house the business and formulate new group rates along with underwriting guidelines will be through the development of a stand alone group company. This strategy is being investigated for the future."

[24]The conclusion that the Covenant opportunity was neither disclosed to Hanover nor rejected by the board before being pursued by Sutton is based on Sutton's own admissions uncontradicted at trial.

The defendants mischaracterize the evidence in arguing that Hanover already was aware of the Covenant opportunity from sources other than Sutton, investigated the opportunity, and decided not to pursue Covenant. First, as emphasized above, the focus of this claim is on Sutton's duty to disclose the corporate opportunity, not on Hanover's knowledge of the opportunity from other sources. Second, the defendants distort the evidence when they represent that James Richardson, vice-president of technical services at Hanover, stated that Hanover was not interested in the Covenant opportunity. The evidence

inferences in Sutton's favor, we agree with the trial judge that there can be but one reasonable conclusion — the Covenant situation was a corporate opportunity that Sutton failed to disclose to Hanover and instead diverted for his own benefit. We, therefore, affirm the allowance of Hanover's motion for judgment notwithstanding the verdict.

c. *Damages entered on count I.* Hanover challenges the judge's award of only nominal damages in the amount of $1.00 on count I, after granting Hanover's motion for judgment notwithstanding the verdict.[25] Hanover moved for a new trial on the issue of damages pursuant to Mass.R.Civ.P. 59(a), which was denied. Hanover claims error in the denial of this motion.

Because the jury found for the defendant on count I, and so did not reach the issue of damages, Hanover complains that it was deprived of the chance of having a jury decide its damages for lost corporate opportunity. Though ruling in Hanover's favor on count I upon Hanover's motion for judgment notwithstanding the verdict, the judge concluded that the evidence of the value of lost corporate opportunity introduced at trial was too uncertain to go to a jury, awarded nominal damages, and ordered equitable relief under count V. See *Van Brode Group, Inc.* v. *Bowditch & Dewey*, 36 Mass. App. Ct. 509, 520-523 (1994).

Hanover sought to prove its damages for lost corporate opportunity by introducing evidence of the value of Covenant licenses·as of May 24, 1994, the date of their transfer to IPI. Hanover claims that the corporate opportunity it lost by Sutton's breach of loyalty was the chance to acquire those licenses

---

shows that Jane Marston, an underwriter of Hanover, contacted William Whitehead, an officer of a Hanover affiliate, and informed him that the Woodland Group, an entity owned by Covenant that provided third-party administration services, might be for sale, as Covenant was put into receivership. Marston gave Whitehead a contact name to inquire into the possibility. Whitehead pursued the contact and then filed a report of his pursuits with Richardson. Richardson said Hanover was not interested in the sale of the Woodland Group. Hanover's disinterest in the Woodland Group, however, is not equivalent to a disinterest in Covenant.

[25]The judge stated:

"I am not satisfied as to the value of the Covenant opportunity. There was testimony by Hanover's expert as to its value and I reject that testimony insofar as it purports to offer an amount. In my view, on this record the amount is uncertain. And so, I'm going to grant Hanover nominal damage of one dollar on count 1."

for a purchase price of $1.5 million between August, 1993, and May, 1994. Hanover's expert placed the market value of the Covenant licenses as of the date they were transferred to IPI at $2.4 million. Based on that figure, minus the purchase price paid by IPI, Hanover claims lost profit damages of at least $900,000.

Over objection, Hanover's expert, Herman Shwide, was permitted to testify as to the value of the Covenant licenses.[26] At the hearing on Hanover's motion for judgment notwithstanding the verdict, however, the judge expressly rejected Shwide's opinion of the market value of the Covenant licenses as too uncertain for any jury to consider it as evidence of the value of the lost opportunity that Hanover should recover against Sutton.

In determining the remedy for Sutton's breach, the judge properly considered the gain to Sutton through his usurping of the corporate opportunity. "Where a corporate fiduciary obtains a gain or advantage through a violation of his duty of loyalty, a court may properly order restitution of the gain, so as to deny any profit to the wrongdoer and prevent his unjust enrichment." *Demoulas*, 424 Mass. at 556. In the absence of evidence at trial regarding Sutton's profits derived from his stock purchase,[27] the judge appropriately granted Hanover equitable relief under count V.[28]

4. *Count III — G. L. c. 93A claim against IPI.* Hanover and IPI appeal from the judgment entered in favor of Hanover against IPI, awarding $1.00 in nominal damages and $168,154.04 in attorneys' fees and costs, for violation of G. L. c. 93A, § 11. Hanover and IPI both challenge the sufficiency of the judge's findings of fact. See Mass.R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996). Additionally, Hanover argues that the judge erred in awarding $1.00 in nominal damages and only $168,154.04 in attorneys' fees and costs. IPI argues that

[26]At trial, the judge, following voir dire, excluded opinion evidence on value offered by one of Hanover's witnesses, Theodore Rupley, because he was deemed not qualified, either as an expert or in his capacity as Hanover's president, to give an opinion of the value of the Covenant licenses. Determining the competency of witnesses to render an opinion on value falls within the trial judge's discretion, which was properly exercised here. See generally *Van Brode Group, Inc.* v. *Bowditch & Dewey*, 36 Mass. App. Ct. at 520.

[27]The record indicates that in May, 1994, Sutton, pursuant to his employment arrangement with IPI, invested $18,610 for a conditional two percent stake in IPI, which would vest over five years.

[28]See our discussion at section 5, *infra*.

the judge erred in finding liability under G. L. c. 93A, § 11, and awarding attorneys' fees. We affirm.

While the judge's findings on count III were abbreviated, they were made just after he made his extensive findings on count V.[29] Those findings clearly were intended to apply to the other nonjury counts. He explicitly based his conclusion that IPI had violated c. 93A on his finding that IPI had "aided and abetted" Sutton in breaching his fiduciary duty to disclose the Covenant opportunity to Hanover. He also found that a proposed insurer such as Covenant "would have been of great interest" to Hanover. We conclude that sufficient facts were found to support the finding of liability on count III.

IPI contends (a) IPI did not come into existence until after the Covenant opportunity expired and, therefore, it could not be liable for a breach of Sutton's fiduciary duty; (b) the conduct complained of arose out of the employment context, and thus is shielded from c. 93A liability; and (c) SKA was not engaged in "trade or commerce" at the time of Sutton's alleged breach. IPI also argues that the judge erred in awarding attorneys' fees because Hanover recovered only nominal damages of one dollar. We reject these claims.

a. *IPI's identity with SKA.* The judge found that Sutton's duty to disclose the Covenant opportunity to Hanover arose during the period from May, 1993, through August 2, 1993, the date when the opportunity was diverted to IPI. IPI argues that it did not come into existence until after this period and, therefore, could not have aided and abetted Sutton in his breach of fiduciary duty. In response, Hanover contends that SKA was incorporated in November, 1992, and IPI was the result of a simple name change from SKA to IPI with no legal distinction in the underlying entity. See *Coken Co.* v. *Department of Pub. Works,* 9 Mass. App. Ct. 586, 590-591 (1980). IPI claims there was not only a name change, but rather a complete financial and structural reorganization of SKA. Whether IPI is the same organization as SKA, with only a different name, is a factual one. The judge specifically found (in his findings under count V) that SKA and IPI were the same corporation.

---

[29]Before dictating his findings, the judge stated that the case "does stand and fall on count 1," and that "count 5 . . . is the non-jury mirror of count 1." At another point the judge referred to the intertwining between counts III and V, and in his discussion of attorneys' fees found that "a common core of facts underpinned counts I, III, and V."

b. *Conduct arising out of the employment context.* We reject IPI's suggestion that because Sutton, as an employee of Hanover, could not be liable to Hanover under G. L. c. 93A, see *Manning* v. *Zuckerman*, 388 Mass. 8, 12-15 (1983), IPI, too, could not be liable under G. L. c. 93A. See *Augat, Inc.* v. *Aegis, Inc.*, 409 Mass. at 172 (c. 93A violation where defendant corporation participated with its employee in violation of his duty of loyalty to former employer).

c. *SKA's engagement in "trade or commerce."* Arguing that SKA was merely a corporate shell that had not engaged in "trade or commerce" at the time of Sutton's alleged breach of fiduciary duty, and had only executed a consulting agreement with William J. O'Brien, Inc., IPI contends that there was no evidence that SKA was a party to any commercial transaction during the relevant period.

In his findings on count V, the trial judge explicitly found that SKA/IPI had engaged in a variety of activities during the relevant period. Grochmal sought funds for the new venture and on August 2, 1993, negotiated a letter of intent for the purchase of a restructured Covenant Mutual. The letter of intent was discussed with Sutton and the record shows that it was between "Insurance Partnerships, Inc. [a] to-be-formed Connecticut Corporation" and the Connecticut Insurance Department. It was signed by the chairman of Northington, "[o]n behalf of Insurance Partnerships, Inc." The record also shows that on July 19, 1993, People's Bank wrote to IPI that it had approved its request for a ten million dollar loan for its Covenant venture. These activities come within the rubric of "trade or commerce" as defined in c. 93A, § 1(*b*):

> " 'Trade' and 'commerce' shall include the advertising, the offering for sale, . . . of any . . . security as defined in subparagraph (k) of section four hundred and one of chapter one hundred and ten A [30] and any contract of sale of a commodity for future delivery, and any other article,

---

[30]General Laws c. 110A, § 401(*k*), as inserted by St. 1972, c. 694, § 1, provides: " 'Security' means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement . . . preorganization certificate or subscription; transferable share; investment contract; voting-trust certificate; certificate of deposit for a security; . . . or, in general, any interest or instrument commonly known as a 'security,' or any certificate or interest or participation in, temporary or interim

commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth."

G. L. c. 93A, § 1(*b*), as amended by St. 1987, c. 664, § 1. See *Augat, Inc.* v. *Aegis, Inc.*, 409 Mass. 165 (1991) (c. 93A violation where plaintiff's employee secretly solicited other key employees to join competing *to-be-formed* corporation). There was no error in finding a c. 93A violation.

d. *Attorneys' fees.* IPI argues that the judge erred in awarding attorneys' fees under G. L. c. 93A, § 11, because Hanover recovered only nominal damages on this claim. "A plaintiff suing under § 11 . . . cannot recover attorneys' fees for merely identifying an unfair or deceptive act or practice. Under § 11, that unfair or deceptive conduct must have had some adverse effect upon the plaintiff, even if it is not quantifiable in dollars." *Jet Line Servs., Inc.* v. *American Employers Ins. Co.*, 404 Mass. 706, 718 (1989). IPI argues that Hanover suffered no "adverse effect" and claims that this is evident in the award of only nominal damages which cannot be considered equivalent to an "adverse effect." The award of nominal damages on count III was informed by the judge's findings on count I. See note 29, *supra*. Rather than finding that Hanover suffered no adverse effect, the judge, as is evident from his findings on count I, considered the extent of the damages to be "uncertain" and not quantifiable. See note 25, *supra*.

Moreover, Hanover obtained equitable relief against Sutton and IPI. IPI violated c. 93A by participating with Sutton in the breach of the latter's duty to disclose the Covenant opportunity to Hanover. A constructive trust was placed on Sutton's shares and an injunction issued against IPI enjoining it from transferring these shares.[31] Equitable relief is authorized under § 11. This is not a case where the only recovery is in the form of attorneys' fees, see *Jet Line, supra* at 718, and the fee award here falls within the statutory provision allowing an award of reason-

---

certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

[31]The judgment on count III entered several months after the judgment on count V. That the relief awarded in the judgment under count V was not repeated in count III is not of significance. Duplicative relief could not in any event be awarded.

able attorneys' fees "in addition to other relief."[32] As stated in *Star Financial Servs., Inc.* v. *Aastar Mort. Corp.*, 89 F.3d 5, 15 (1st Cir. 1996), "the language in *Jet Line* is not necessarily inconsistent with an award of attorneys' fees to a plaintiff that receives injunctive relief only."

We turn to the arguments of Hanover and IPI who both claim that the judge erred in calculating the amount of attorneys' fees under count III. Hanover contends that the judge abused his discretion in entering an award that was internally inconsistent with his written decision. In his order on counsel fees, the judge stated, "In the court's judgment, counsel submitted hourly rates [that] are consistent with rates charged by competent counsel in the Boston area of comparable standing and skill in comparable cases with similar outcomes achieved at trial." Hanover argues that it was error for the judge to make this statement and then enter an award that was approximately one-third the amount of the fees it earned and submitted to the court.

We disagree and we find no abuse of discretion in the judge's award of $150,000 as reasonable attorneys' fees and $18,154.04 as reasonable expenses. "The amount of a reasonable attorney's fee, awarded on the basis of statutory authority is largely discretionary with the judge, who is in the best position to determine how much time was reasonably spent on a case, and the fair value of the attorney's services." *Fontaine* v. *Ebtec Corp.*, 415 Mass. at 324. While the judge accepted the rates submitted by Hanover's counsel, there were other factors — the reasonableness of the time spent by counsel, and the results achieved which include the other issues in the case on which Hanover was unsuccessful — warranting the judge's reduction in the amount of fees requested.

In contrast, IPI argues that the judge erred in not limiting the award of attorneys' fees to provable hours directly attributable to the G. L. c. 93A claim. We recognize that, "[f]or services to be compensable under Chapter 93A, there must be a relationship 'between the depth of the services provided and what is at stake.'" *Industrial Gen. Corp.* v. *Sequoia Pac. Sys. Corp.*, 849 F. Supp. 820, 826 (D. Mass. 1994), quoting from *Morse* v.

---

[32]General Laws c. 93A, § 11, as inserted by St. 1972, c. 614, § 2, provides: "If the court finds in any action commenced hereunder, that there has been a violation of section two, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorneys' fees and costs incurred in said action."

*Mutual Fed. Sav. & Loan Assn.*, 536 F. Supp. 1271, 1283 (D. Mass. 1982). However, "[a]s a rule, where a single chain of events gives rise to both a common law and a Chapter 93A claim, apportionment of legal effort between the two claims is not necessary . . . . [Nonetheless], effort expended on an unsuccessful common law claim brought in concert with a successful Chapter 93A claim should not be compensated" *Id.* (citations omitted). The judge recognized these principles and, in awarding attorneys' fees, found "a common core of facts underpinned counts I, III and V."

5. *Count V — Declaratory judgment against Sutton for loss of corporate opportunity.* Pursuant to G. L. c. 231A, § 1, Hanover sought a declaratory judgment against Sutton for loss of a corporate opportunity. Having found that the Covenant situation was a business opportunity for Hanover, which Sutton failed to disclose and instead diverted for his own benefit in breach of his fiduciary duty to Hanover, the judge entered judgment in favor of Hanover on count V. Since the judgment notwithstanding the verdict in favor of Hanover on count I is affirmed, the defendants' argument that the decisions on counts I and V are inconsistent is without merit.

The defendants also argue that the type of relief awarded on count V was error. They contend that, by imposing a constructive trust, the judge made Hanover a minority shareholder of the new insurance company, IPI, and placed competing companies in the odd position of owing fiduciary duties to one another. We find no error in the relief granted.[33] See *Demoulas, supra* at 545 & n.50 (to remedy breach of fiduciary duty by

---

[33]Having found liability on count V, the judge awarded the following remedy:

"5. John Sutton, as trustee, holds in a constructive trust for the benefit of The Hanover Insurance Company the following property:

    (a) 1,861 shares of the common stock in Insurance Partnerships, Inc. now known as the Covenant Group, Inc. purchased by John Sutton for $18,610.00 on or about May 24, 1994; and

    (b) an option to purchase 2,791.5 shares of the common stock in Insurance Partnerships, Inc. now known as the Covenant Group, Inc.

diversion of corporate opportunity, trial judge could have properly ordered defendant corporate officer to transfer to plaintiff the defendant officer's shares in competing corporation).

6. *Count VII — G. L. c. 93A claims against IPI and William*

granted to him, 'his heirs and assigns' on or about May 24, 1994.

"6. Upon the tender by The Hanover Insurance Company of $18,610.00, to John Sutton for the 1,861 shares of common stock, John Sutton shall forthwith endorse and transfer to The Hanover Insurance Company, or its designee, in a manner sufficient to vest legal ownership of said shares, the shares of stock described herein which are held by John Sutton, as constructive trustee.

"7. Within ten (10) days of the entry of this Order by the Court, John Sutton shall execute and deliver to The Hanover Insurance Company, in a form acceptable to counsel for The Hanover Insurance Company, or its designee, a written assignment of John Sutton's option to purchase 2,791.5 shares of the common stock in Insurance Partnerships, Inc. now known as the Covenant Group, Inc. which is held by John Sutton as constructive trustee.

"8. Upon the receipt of said shares, The Hanover Insurance Company shall have the right to transfer said shares into its name or the name of its designee on the books of Insurance Partnerships, Inc. now known as the Covenant Group, Inc., as attorney-in-fact for John Sutton.

"9. The orders of the Court pursuant to Paragraphs 5 through 8 above are hereby stayed pending appeal or further order of this Court.

"10. Insurance Partnerships, Inc. now known as the Covenant Group, Inc. and its officers, directors, agents, employees and attorneys are hereby restrained and enjoined from taking any action to change the record ownership of the shares or options which are subject to this order on the books or official records of the corporation pending further order from this Court.

"11. Until legal ownership of said shares and options are transferred to The Hanover Insurance Company or its designee, John Sutton . . . shall be enjoined and restrained from transferring, selling, encumbering or otherwise disposing of or creating any legal or equitable interest in said shares and options in any manner which is inconsistent with the terms of this Order."

*J. O'Brien, Inc.* Hanover claimed against IPI and William J. O'Brien, Inc., for violation of G. L. c. 93A. The complaint alleged that the acts of the defendants in procuring the breaches of contracts of Sutton and O'Brien (count VI) "were unfair and deceptive acts or practices in commerce or trade or were unfair competition." The judge, reserving this claim for himself, entered judgment for the defendants.

On appeal, Hanover challenges the sufficiency of the judge's findings of fact and conclusions of law on this count. See Mass-.R.Civ.P. 52(a). Since the judge's findings on count VII were most abbreviated, and since we have in section 2b of this opinion, *supra*, remanded count VI for further discovery, we also remand count VII for further findings. Such findings should be made even if the verdict on count VI is to stand.

7. *Conclusion.* We summarize the conclusions we have reached on the issues before us:

(1)  *Count I.* We affirm the allowance of Hanover's motion for judgment notwithstanding the verdict and the award of nominal damages.

(2)  *Count III.* We affirm the finding of liability under G. L. c. 93A and the judgment for attorneys' fees.

(3)  *Count V.* We affirm the finding of liability and relief awarded.

(4)  *Count VI.* We vacate the judgment for the defendants. The case is remanded for further discovery concerning events from June 1, 1994, through December 31, 1994. Depending on the results of discovery, a new trial may be warranted on count VI, or the judgment on the original verdict shall be restored.

(5)  *Count VII.* We vacate the judgment and remand for further findings of fact.

We affirm the judgments and the relief awarded in counts I (judgment notwithstanding the verdict), III, and V. The judgments for the defendants in counts VI and VII are vacated, and the case is remanded for further discovery pertaining to those counts from June 1, 1994, through December 31, 1994. The judge, after discovery and such hearings as he deems appropriate, shall determine whether a new trial is warranted on count

VI. He shall issue findings of fact and a judgment on count VII which shall, among other things, reflect the developments, if any, on remand of count VI.

*So ordered.*